AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Ashley A. Chung, (312) 697-4089



FILED
3/30/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case Number:   20 CR 826

The Skype accounts live:karlquilter ("**Subject Account 1**") and live:51746ca6e2623e9e ("**Subject Account 2**"), further described in Attachment A (collectively, the "**Subject Accounts**")

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Steven Moran, a Special Agent of the Homeland Security Investigations, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Western District of Washington, there is now concealed:

### See Attachment A, Part III

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, fruits, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 2251, 2252, 2252A, 2422, and 2423 | sexual exploitation of children; possession, receipt and distribution of child pornography; coercion and enticement of minors; and travel with intent to engage in illicit sexual conduct. |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

STEVEN MORAN, Special Agent
Homeland Security Investigations
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: March 30, 2021

_____
*Judge's signature*

City and State: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT            )
                                                                    )
NORTHERN DISTRICT OF ILLINOIS      )

## AFFIDAVIT

I, Steven Moran, being duly sworn, state as follows:

1.      I am a Special Agent with the Homeland Security Investigations. I have been so employed since approximately March 2020.

2.      As part of my duties as Homeland Security Investigations Special Agent, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the sexual exploitation of children, travel with intent to engage in illicit sexual conduct with minors, and the illegal production, distribution, receipt, and possession of child pornography. I have received training in the area of child pornography and child exploitation, and have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in multiple forms of media, including computer media. I also have participated in the execution of multiple federal search warrants, many of which have involved child exploitation and/or child pornography offenses. I have participated in the execution of multiple federal search warrants.

3.      This affidavit is made in support of an application for a warrant to search, pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), for information associated with a certain account that is stored at the premises owned, maintained, controlled, or operated by Microsoft Corporation, a business with offices located at 1 Microsoft Way, Redmond, Washington 98052. The

accounts to be searched are the Skype accounts live: karlquilter ("**Subject Account 1**"), and live:51746ca6e2623e9e ("**Subject Account 2**") (collectively, the "**Subject Accounts**"), which are further described in the following paragraphs and in Part II of Attachment A. As set forth below, there is probable cause to believe that in the account, described in Part II of Attachment A, in the possession of Microsoft, there exists evidence, instrumentalities, fruits, and contraband described further in Attachment B concerning the sexual exploitation of children, in violation of Title 18, United States Code, Section 2251; possession, receipt, and distribution of child pornography offenses, in violation of Title 18, United States Code, Sections 2252 and 2252A; the coercion and enticement of minors to engage in sexual activity, in violation of Title 18, United States Code, Section 2422; and the travel with intent to engage in illicit sexual conduct with minors in violation of Title 18, United States Code, Section 2423, (the "**Subject Offenses**").

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of the **Subject Offenses**, are located in the **Subject Accounts**.

2

## I.     BACKGROUND INFORMATION

### A.     Skype

5.     In my training and experience, as well as from my review of publicly available information, I know that Skype is a software product that allows users to conduct video chats and voice calls over the internet. Skype users can also send instant messages, exchange files and images, send video messages, and create conference calls. Skype software is available for use on personal computers as well as smartphones and tablets. Skype was first released in 2003. It was acquired by Microsoft in 2011 and is now a division of Microsoft Corporation.

6.     Microsoft's privacy statement, which was last updated in January 2020 and is available at *https://privacy.microsoft.com/en-us/privacystatement*, states that Microsoft can collect the content of files and communications that a user inputs, uploads, receives, creates and controls. This can include the contents of chats, including audio, video and text.

7.     According to support information provided by Microsoft and available at *https://support.skype.com/en/faq/FA34893/how-long-are-files-and-data-available-in-skype*, "Skype stores files and photos you've shared, calls you've recorded, and other items for easy access across all your devices." Messages, videos and pictures are available until they are deleted or dated back to April 2017,[1] and chat titles are

---

[1] From other open-source internet research, it appears that the reference to April 2017 was because the Skype support information was posted to Microsoft's web site in April 2019. It appears Skype will save chat history for a period of two years.

available until deleted or users leave conversations. Thus, depending on when a chat occurred and whether a user elected to delete it, it is possible that the content of chats will be found on servers controlled by Microsoft.

8. Skype allows subscribers to create user accounts and create a unique member name. The user can change this username at any time. The Skype ID associated with the Skype account, by contrast, cannot be changed by the user. For example, Skype member "exampleuser123" could change the member name to another series of letters, numbers or symbols, but the Skype ID associated with the **Subject Accounts**, *e.g.*, live:exampleuser123, would remain the same.

9. A Skype subscriber can also store contact lists on servers maintained and/or owned by Microsoft. In my training and experience, evidence of who was using an online account, such as Skype, may be found in address books or contact lists.

10. Based on information provided by Skype to law enforcement, the following types of information will be provided upon receipt of appropriate legal process:

- Registration Details: information captured at time of account registration;
- Billing Address: User-provided billing addresses;
- Payment Method/Instrument Data;
- Purchase History: transactional records;
- IP Logs: IP addresses captured at the time of the user login to the Skype service;
- Skype Number Service History: list of Skype Number(s) subscribed to by a user;
- Skype Out Records: Historical call detail records for calls placed to the public switched telephone network (PSTN);

4

- <u>Skype Number Records</u>: Historical call detail records for calls received from the public switched telephone network (PSTN);
- <u>SMS Records</u>: SMS historical detail records;
- <u>E-mail records</u>: historical record of e-mail change activity;
- Skype username's Contact/Buddy List; and
- Skype username's Chat/Media content.

**11.** Chat content on Skype's servers may enable investigators to identify other customers who may participate in the abuse of children by directing the activity, as well as additional co-conspirators. The **Subject Accounts**' contact lists may likewise serve to identify additional victims and other co-conspirators.

12. Therefore, the computers of Microsoft Corporation are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Microsoft Corporation, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Microsoft Corporation, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Microsoft Corporation to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A.

5

## II.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNTS

13.    In summary, KARL QUILTER has been charged by criminal complaint in the United States District Court for the Northern District of Illinois with receipt of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(2)(A) in case 20 CR 826. As part of the investigation into QUILTER, law enforcement discovered sexually explicit communications (and images) exchanged between QUILTER and multiple minors victims located in the Philippines. During the execution of a search warrant at QUILTER's residence, law enforcement recovered, among other things, an LG Stylo 4 cellular phone (the "LG Phone") and a Samsung model GT-P5210 tablet (the "Samsung Tablet"), from QUILTER's bedroom. Further law enforcement review and analysis of these devices revealed Skype communications in which QUILTER used the **Subject Accounts** to communicate with certain of his minor victims, including Minor E and Minor F, who both reside in the Philippines.

### A.    Communications Between Facebook Account 1 and Minor A

14.    According to information provided to law enforcement by the National Center for Missing and Exploited Children ("NCMEC"), on or about June 29, 2020, Facebook reported to NCMEC the possible enticement and sexual exploitation of a minor on its site.[2]

---

[2] In my training and experience, I have learned that, according to Facebook's operational guidelines for law enforcement authorities, Facebook reports all apparent instances of child exploitation appearing on its site from anywhere in the world to NCMEC. NCMEC

15.     According to NCMEC, a Facebook account bearing display name "Mathew Jones" ("Facebook Account 1") had communicated through Facebook Messenger with another Facebook account believed to be used, based on the content of the communications, by a child victim approximately fifteen or sixteen years old ("Minor A"). Also according to NCMEC, as of June 29, 2020, Minor A's estimated location was Silay City, Philippines, and the user of Facebook Account 1's estimated location was Northbrook, Illinois. The NCMEC report to law enforcement also included excerpts of communications between the Facebook accounts, provided by Facebook to NCMEC.

16.     For example, according to NCMEC, on or about May 16, 2020, between approximately 6:19 a.m. UTC to 6:23 a.m. UTC, the Facebook accounts exchanged the following messages:

| | |
|---|---|
| Minor A: | i'm 15 years old and tomorrow its m birthday and im 16 years old tomorrow |
| Facebook Account 1: | Am in mt Bed sick right now with Covid19 am trying to get well |
| Minor A: | and you how old are you? |
| Facebook Account 1: | Am very old can u take a guess from my pic how old I am |
| Minor A: | true? Rest on your own and you will be well, get well soon |
| Minor A: | maybe your 35 years old? |

coordinates with the International Center for Missing and Exploited Children and law enforcement authorities around the world.

       Facebook Account 1:      no am 55 years old too old for you[3]

17.     Also according to NCMEC, on or about May 27, 2020, beginning at approximately 4:57 p.m. UTC, the Facebook accounts exchanged the following messages:

       Facebook Account 1:      If u do what i tell u then i can trust u and i will make sure u can buy food for 2 weeks and your medication but i want to see your face and i want to see your Boobs Pussy clearly i want u to open your legs wide and your Pussy so i can see the beauty inside and dont be shy because if you do this u will be my gf so no need to be shy

       Facebook Account 1:      Am not forcing u but if u do this think of your little sister that she can est for 2 weeks everyday 3 meals a day and u get well

18.     Also according to NCMEC, on or about May 27, 2020, at approximately 5:03 p.m. UTC, the Facebook accounts exchanged the following messages:

       Minor A:          I did it for you and I hope you are done

       Minor A:          I did this to help my brothers and sister and to eat more for a day

19.     Minor A's Facebook account then uploaded additional content that has since been obtained pursuant to a search warrant to Facebook, consisting of approximately three nude images of Minor A: (1) at approximately 5:05 p.m. UTC, a frontal image of Minor A, standing with her hands at her sides, nude and facing the

---

[3] As noted below in footnote 8, according to Illinois Secretary of State records, QUILTER was in fact 55 years old at the time of these messages.

phone or camera, with her face, breasts, and mons pubis visible; (2) at approximately

5:11 p.m. UTC, an image of Minor A completely nude and facing sideways, with her

face, breasts, and the side of her buttocks visible; and (3) at approximately 5:17 p.m.

UTC, an image appearing based on the angle to be a frontal image of Minor A taken

as a "selfie"—that is, by Minor A while she was holding the phone or camera—while

she was sitting with her legs apart and the phone or camera between her legs facing

her, such that her face, breasts, and labia are visible.[4]

     20.    Also according to NCMEC, on or about May 27, 2020, at approximately

5:22 p.m. UTC, the Facebook accounts exchanged the following messages:

> Facebook Account 1:    But u did not do what I ask u to open your legs and yoir pussy so I can see inside baby
>
> Minor A:    will I show my pussy?
>
> Facebook Account 1:    Yes baby u sit on Bed open your legs wide and open your pussy so I can see clearly inside pussy how beautiful it is baby don't be shy

     21.    Also according to NCMEC, on or about May 27, 2020, at approximately

5:29 p.m. UTC, the Facebook accounts exchanged the following messages:

> Facebook Account 1:    Now i can accept your Apology and u can be my gf if u want because u doing your promise can u take your hand and open pussy baby

---

[4] With respect to the images exchanged between Minor A's Facebook account and Facebook Account 1, referenced in paragraphs 19, 22, and 27 of this section, I compared these images to photos displayed on Minor A's publicly available Facebook page and believed to be photos of the user of the account, Minor A, based on the volume and angles of the photos, some of which appear to have been taken as "selfies." Based on my review, the images referenced in paragraphs 19, 22, and 27 appear to be nude photos of the user of the Facebook account, Minor A.

|  | |
|---|---|
| Facebook Account 1: | I want to tell u that u have a very beautiful Body and your Boobs is so nice and your pussy is beautiful i love it |

22.     Minor A's Facebook account then uploaded additional content that has since been obtained pursuant to a search warrant to Facebook, consisting of a frontal image of Minor A, in which she is seated on the ground with her right leg up on the bed, wearing a gray shirt pulled up so that her breasts are visible and nude from the waist down, such that her face, breasts, and labia are visible.

23.     Also according to NCMEC, on or about May 27, 2020, at approximately 5:32 p.m. UTC, the Facebook accounts exchanged the following messages:

|  | |
|---|---|
| Facebook Account 1: | Ii want u to take fingeres and open pussy baby i want to see inside pussy put camera closer |
| Minor A: | actually i love you too and i assure you i don't fool you and I love you and thank you for being here to help me and i'm happy today |
| Facebook Account 1: | I cant wait to have Sex with u in December as u promise you will give me your Virginity |
| Minor A: | wait oh my gosh my older brother is awake but he has never seen me picture naked |
| Minor A: | Yes sure and when you send money love? |
| Minor A: | so that I can buy what we can eat and grocery |
| Facebook Account 1: | Ok am getting paid on friday my day that is saturday your day is that ok my love |

10

Minor A:                    Ok I'll wait and advance thankyou my love [kissing emoji] [four heart emojis][5]

24.     Also according to NCMEC, on or about May 27, 2020, at approximately 5:40 p.m. UTC, the Facebook accounts exchanged the following messages:

Facebook Account 1:         U did not take the pic i told u the one i want you to take your fingers and open your pussy i wanted to see inside pussy how beautiful and pink

Minor A:                    later I was going to pass the picture again because my brother woke up and he almost saw me taking a picture naked

Facebook Account 1:         But next time please never ever lie to me or Scam me because as i told u if u want a good life be honest to me and truthful always. Be a good girl am a very good bf if u are honest

Minor A:                    I will never deceive you and love you and will never do anything bad iloveyouuuu [three heart emojis]

Minor A:                    I'm just as happy today and lucky as I am [four kissing emojis]

Minor A:                    Love i want buy slipper

25.     Minor A's Facebook account then uploaded additional content that has since been obtained pursuant to a search warrant to Facebook, consisting of an image of pink slippers.

---

[5] In my training and experience, I have learned that emojis are digital images or icons used to express ideas or emotions in electronic communications.

26.     Also according to NCMEC, on or about May 27, 2020, at approximately 5:47 p.m. UTC, the Facebook accounts exchanged the following messages:

Minor A:                    I want to sleep because I haven't slept yet and tomorrow let's talk and be careful there iloveyouuuuu [four heart emojis]

Facebook Account 1:     Ok but u will continue with the pics i told u ok thank u and see how easy that was and don't be shy u are my gf now I love u

27.     Minor A's Facebook account then uploaded additional content that has since been obtained pursuant to a search warrant to Facebook, consisting of a frontal image of Minor A that appears based on the angle to have been taken as a "selfie," while she was sitting with her legs apart and the phone or camera between her legs facing her. Minor A's face and breasts are visible, and she appears to be using one hand to open her labia toward the phone or camera.

28.     Also according to NCMEC, on or about May 27, 2020, at approximately 6:19 p.m. UTC, the Facebook accounts exchanged the following messages:

Minor A:                    Doneee iloveyoutoooo [four heart emojis]

Facebook Account 1:     Very good job an so proud of u and u have a very beautiful Pink Pussy i love it cant wait until December to taste it

Facebook Account 1:     Baby never be shy to me ok am your Man

Facebook Account 1:     And i will never hurt u

B.      **Identification of KARL QUILTER as User of Facebook
        Account 1**

29.     On or about September 17, 2020, United States Magistrate Judge Beth
W. Jantz issued search warrants for Facebook Account 1 and Minor A's Facebook
account (20 M 488). The search warrant results provided by Facebook included,
among other things, the above messages and images exchanged between Facebook
Account 1 and Minor A, and other communications between Facebook Account 1 and
Minor A and between Facebook Account 1 and other Facebook accounts believed to
be used by other minor victims in the Philippines (including, among others, "Minor
E," and "Minor F"), as well as IP addresses used to access Facebook Account 1. As
discussed further below, based on the IP addresses used to access Facebook
Account 1, and the content of communications to and from Facebook Account 1, law
enforcement identified KARL QUILTER as the user of Facebook Account 1.

30.     According to the search warrant results from Facebook, Facebook
Account 1 was created on or about February 8, 2018, appears to have been suspended
on or about June 19, 2020 (as that is the last date for which content was produced),
and was deactivated in or about July 2020. Facebook Account 1 appears to have
communicated with Minor A's Facebook account from approximately May 1, 2020 to
June 16, 2020, during which time the accounts exchanged sexually explicit messages
and images and the users, QUILTER and Minor A, appear to have engaged in video
calls (as discussed further in paragraph 36 below).

13

31.     According to Comcast records, for the most recent time period for which records are available (approximately April 6, 2020, to June 19, 2020),[6] all of the Comcast IP addresses used to access Facebook Account 1 were either subscribed to KARL QUILTER with a Chicago residence as the listed service address and billing address, or were subscribed to a nursing center at which—according to the search of a law enforcement database (*see* paragraph 33 below)—QUILTER previously worked.[7]

32.     More specifically, according to Comcast records, at least eight of the Comcast IP addresses used to access Facebook Account 1 in the above time period were subscribed to QUILTER at his Chicago address.

33.     Also according to Comcast records, on or about June 19, 2020, an IP address used to access Facebook Account 1 was subscribed to a nursing and rehabilitation center with a listed service address in Chicago, Illinois. ("Nursing Center A"). According to a search of a law enforcement database, QUILTER appears to be employed as a Certified Nurse's Assistant (or "CNA") at a nursing center located in Northbrook, Illinois ("Nursing Center B") and appears to have been employed previously at Nursing Center A.

---

[6] Based on my training and experience, I know that Comcast only retains IP address assignment information for a certain period of time (approximately six months).

[7] Other IP addresses used to access Facebook Account 1 were serviced by AT&T. According to AT&T records, the one of the IP addresses was registered to a third-party individual in Indianapolis, Indiana, another was registered to a third-party business account, and a third had no associated records because AT&T does not retain records regarding mobile IPs.

34.     According to Illinois Secretary of State records, KARL QUILTER is a 57-year old black male who resides at his Chicago address.[8]

35.     Also according to the search warrant results from Facebook, on or about May 21, 2020, Facebook Account 1 sent a photograph that appears to be a "selfie" of a black male wearing blue medical scrubs. Based on and comparison to the driver's license photograph of QUILTER, I identified the black male in the photograph as QUILTER.

36.     Also according to the search warrant results from Facebook, on or about June 4, 2020, at approximately 9:05 a.m. UTC, Minor A's Facebook account sent three images appearing to be screenshots from a video chat between Minor A and QUILTER. More specifically, on the right side of all three screenshots was a young Asian female, while on the left side of all three screenshots was an older black male. Based on comparison to publicly available photographs of Minor A from her public Facebook page, and the driver's license photograph of QUILTER, I identified the female in the video-call screenshots as Minor A and the male as QUILTER.

37.     According to the search warrant results from Facebook, QUILTER, using Facebook Account 1, also communicated with the users of other Facebook accounts regarding QUILTER's travels overseas in late 2017 and early 2018, which I

---

[8] According to Illinois Secretary of State records, QUILTER's birthdate is in December. Thus, at the time of his messages with Minor A in May 2020, he was 55 years old.

compared to Customs and Border Protection ("CBP") records for QUILTER's international travel.

38.     For example, on or about February 15, 2018, QUILTER, using Facebook Account 1, sent a photograph of himself[9] to another Facebook account and wrote, "that's me I just came back from Philippines in January 15th," and "I was in Silay . . . . and Guinhalaran."

39.     Also, on or about January 1, 2019, QUILTER, using Facebook Account 1, sent messages to another Facebook account saying, "I ask that because I go to phillipines I visit Guinhalarn Silay Talisay Bacolod Iloilo Cebu," and "I was their last December until January."

40.     Also, on or about September 19, 2019, QUILTER, using Facebook Account 1, sent message to another Facebook account saying, "Yes I was their [sic] in Philippines twice," and "I had my Birthday Party at Sunburst Resort in 2017 December 21st. . . ."

41.     According to CBP records, on or about November 28, 2017, QUILTER traveled from Chicago to Hong Kong, returning from Hong Kong to Chicago on or about January 12, 2018. Based on my training and experience, I have learned that the CBP database records only the departure port in the United States and the international port(s) to which the traveler directly departs from the United States,

---

[9] Based on comparison to QUILTER's driver's license photo, I identified this photo as one of QUILTER.

and not other subsequent destinations of the traveler. Thus, the timeframe during which QUILTER was in Asia is consistent with his having traveled to and been present in the Philippines in December 2017 and January 2018, as described in the above messages.

42.    In addition, as noted above in paragraphs 38 and 39, QUILTER, using Facebook Account 1, referenced having traveled to Guinhalaran and Silay, cities located near one another in the Philippines. In addition, according to the results of an open source search, Sunburst Resort, where QUILTER, using Facebook Account 1, referenced having celebrated his birthday in December 2017, appears to be located in Silay City, Philippines.

43.    Based on my review of QUILTER's communications using Facebook Account 1, it appears that a number of the suspected minor victims with whom QUILTER has communicated, including, for example, Minor A, Minor E, and Minor F, reside in or around Silay City, based on the locations listed on the publicly available Facebook pages for their accounts and their communications with QUILTER.

### C.    Facebook Communications With Minor E Further Identifying QUILTER

44.    According to the search warrant results from Facebook, between approximately February 8, 2019, to June 19, 2020, QUILTER, using Facebook Account 1, communicated with another Facebook user, who—based on the content of

the communications and the images on her publicly available Facebook page—is believed to be another minor female in the Philippines ("Minor E").[10]

45.    For example, on or about February 8, 2018, at approximately 4:37 p.m. UTC, the following messages were exchanged between QUILTER, using Facebook Account 1, and the first of Minor E's Facebook accounts:

> Minor E:    Who is thiiiis?
>
> QUILTER:    Go to Skype and read my message: I left u
>
> Minor E:    Daddy this is u?
>
> Minor E:    Send me your pic if this is u

46.    At approximately 4:45 p.m. UTC, QUILTER, using Facebook Account 1, sent a photo to Minor E's Facebook account. The photo depicts a young Asian female, believed based on comparison to photographs from the publicly available Facebook page for Minor E's Facebook account to be Minor E, resting her head on her hand with her elbow resting on the leg of a black male, whom I recognize as QUILTER based on comparison to his driver's license photo and other photographs from his Facebook account. Both are fully clothed and smiling at the camera. Based on my training and experience, the content and context of the communications, and my knowledge of the investigation, I believe that QUILTER has had physical contact

---

[10] According to records from Facebook, Minor E's Facebook account is subscribed to a user whose name appears consistent with Minor E's listed display name. According to law enforcement review of a copy of a Philippine birth certificate, Minor E's first and last name as associated with her Facebook account are consistent with the first and last names of a Philippine female born in 2003.

with Minor E and also uses other applications, such as Skype, to communicate with Minor E and other minor victims.

47.     Also on or about February 8, 2018, Minor E's Facebook account sent to QUILTER, at Facebook Account 1, approximately nineteen nude photos of a post-pubescent female, approximately 13 to 16 years of age and—based on comparison of the photos in which the female's face is visible to photographs from the publicly available Facebook pages for Minor E's Facebook accounts—believed to be of Minor E. Some of the images include close-up photographs of Minor E's breasts and labia. In conjunction with these images, the following messages were exchanged between QUILTER, using Facebook Account 1, and Minor E:

> QUILTER:    The last one u send with the 3 pics together on right put your go get inside like that one just like that position
>
> QUILTER:    I hope we will have sex when I go their because u will already be 15 and half
>
> QUILTER:    Maybe 16
>
> Minor E:      Yiz sure

48.     Also on or about February 8, 2018, at approximately 11:51 p.m. UTC, QUILTER, using Facebook Account 1, sent the following message to Minor E's Facebook account identifying himself and his address at his Chicago residence:

> QUILTER:    Ok I already sent you $35.00 US Dollars and you will receive 1,737.59 in Pesos the Tracking # 228-109-2585 WESTERN UNION
>
> QUILTER:    My Name
>                      KARL QUILTER

My Address
4[xxx] WEST ARMITAGE AVE
My City
CHICAGO
My State
ILLINOIS
My Zip Code
606[xx]
My Phone
+1-[xxx-xxx]-5959

49.     On or about February 9, 2018, at approximately 1:56 a.m. UTC, Minor E's Facebook account sent to QUILTER, at Facebook Account 1, the following messages:

| Minor E: | dont reply on this acc. We chat on my second acc. |
|---|---|
| Minor E: | Don't reply on this acc. Dad I will delete this convo! We chat on my second acc. bye. |

50.     Based on my review of the search warrant results from Facebook, I found communications between QUILTER, at Facebook Account 1, and another Facebook account bearing a display name similar to that of Minor E's first Facebook account discussed above. Based on my review of images from the publicly available Facebook page for this second account, as well as the images, videos, and messages sent between this Facebook account and QUILTER, at Facebook Account 1, I believe that this is a second Facebook account used by Minor E. For example, the images and videos sent from this second Facebook account used by Minor E to QUILTER, at Facebook Account 1, include approximately 54 videos of a young female I identified

20

as Minor E, based on comparison to other photographs from the publicly available Facebook pages for both of her accounts.

51.　On or about July 28, 2019, at approximately 4:54 p.m. UTC, QUILTER, using Facebook Account 1, sent the following messages to Minor E's second Facebook account:

> QUILTER:　Do u know how many times u say that to me that when i go their we will have sex well i was their after u told me if i make your Birthday Party we will have Sex and i go their but did we have sex no we did not because i told u I will come visit u then u invite your friends with us so we never alone so how can i Forgive u all the time everytime and u repeat over and over and over Scam to me and say very bad things to me and u go to your bf and do Sex and drink and smoke with the money I send u then u dont chat me anymore u dont do what u say but each time u have problems am the one u come to and remember what about your bf and all those men and boys u have sex with why they dont help you i dont have that kind of money to help your father and i don't have money at this time am sorry

Based on my training and experience, the content and context of this communication, and my knowledge of the investigation, I believe that QUILTER traveled to the Philippines to engage in illicit sexual conduct with Minor E.

52.　On or about January 18, 2020, at approximately 9:08 a.m. UTC, the following messages were exchanged between QUILTER, at Facebook Account 1, and Minor E's second Facebook account:

> QUILTER:　Can i ask how old u will be this coming November
>
> Minor E:　17 daddy
>
> Minor E:　Im 16 now

21

53.     On or about February 20, 2020, at approximately 5:05 p.m. UTC, the following messages were exchanged between QUILTER, at Facebook Account 1, and Minor E's second Facebook account:

> QUILTER:   But tomorrow I will deactivate for ever I will not keep I only make so its easy for u to chat and send me pics but if u not going to send then I don't need a facebook account

> Minor E:   Oh?so what u will say on my parents?

> QUILTER:   That I will just use Skype and Viber[11] because i don't want to chat my old friends from before

Based on my training and experience, the content and context of the communications, and my knowledge of the investigation, I believe that QUILTER uses other applications, including Skype, to communicate with Minor E and other minor victims.

54.     On or about March 11, 2020, at approximately 7:04 p.m. UTC, QUILTER, using Facebook Account 1, sent the following messages to Minor E's second Facebook account:

> QUILTER:   I want to see your face while you putting fingers inside all the way inside if u can make sound i want and dont spend all your time on just touching your Boobs i want u to open Pussy hole so i can see inside like u did before and i want to see fingers going inside i want you to mausterbate until u cum i want to see that pussy so wet and sticky and u making 7 videos of 2 mins each no less time it can be more than 2 mins also i want to see pussy from tbe back u open it wide from back and u can put fingers inside from back

---

[11] Based on my training and experience, I know that Viber is a calling and messaging app with voice and video call functionality, as well as messaging and chat functionalities. I also know that Viber is a multiplatform application that allows for syncing across mobile devices, tablets, and laptop or desktop computers.

22

> too but i want to see it clear not dark not blurry so in each video u do sonethi g different or u can do all kind of things with your pussy and your boobs u can lick your boobs too jyst do a good job and if u dont do what i ask u like i said am not paying the loan cause u promise u will do whatever I say and want and please dekete after u read please for your protection and mine

QUILTER:    Screen shoot and send me tbat u delete all conversations

On or about March 12, 2020, at approximately 2:26 a.m. UTC, Minor E's second Facebook account sent to QUILTER, at Facebook Account 1, approximately seven videos depicting Minor E nude and masturbating.

## D. Facebook Communications with Minor F Further Identifying QUILTER

55.    Also according to the search warrant results from Facebook, between approximately May 16, 2020, to June 19, 2020, QUILTER, using Facebook Account 1, communicated with another Facebook user, who—based on the content of the communications and the images on her publicly available Facebook page—is believed to be another minor female in the Philippines ("Minor F").[12]

56.    For example, on or about May 16, 2020, at approximately 6:37 a.m. UTC, the following messages were exchanged between QUILTER, using Facebook Account 1, and Minor F's Facebook account:

QUILTER:    How old are you

---

[12] According to records from Facebook, Minor F's Facebook account is subscribed to a user whose name appears consistent with Minor F's listed display name. According to law enforcement review of a copy of a Philippine birth certificate, Minor F's first and last names as associated with her Facebook account are consistent with the first and last names of a Philippine female born in 2005.

23

| | |
|---|---|
| Minor F: | im 17 years old and I do not have a boyfriend |
| QUILTER: | Really that is what all girls say and I don't like a girl who lied or not loyal I like a truthful girl |
| Minor F: | yes I am not lying |

57. Approximately one and a half hours later, the following messages were exchanged between QUILTER, using Facebook Account 1, and Minor F's Facebook account:

| | |
|---|---|
| Minor F: | what is your decision? will you buy me a phone? |
| QUILTER: | Don't rush me |
| Minor F: | ok im sorry I love you so much |
| Minor F: | im so excited because we will call and see you in the video call |
| QUILTER: | How can you love me we don't even see each other or know each other u did not even show me a sexy pic so I know I can trust u |
| Minor F: | Ill give you a good picture as long as you promise that you'll give me a phone purchase |
| QUILTER: | Ok send me the pic and don't worry I will buy u a phone |

Minor F's Facebook account then sent approximately eight photos total (not all sent at the same time) depicting a clothed post-pubescent female, believed based on comparison to photographs from the publicly available Facebook page for Minor F's

24

Facebook account to be Minor F. After Minor F's Facebook account sent two of the photos, QUILTER, using Facebook account 1, and Minor F's Facebook account exchanged the following messages:

> Minor F:    im so sexy right? My boobs are big
>
> QUILTER:  Your boobs are just right but I want more sexy
>
> QUILTER:  I love your boobs

58. Also, on or about June 19, 2020, at approximately 12:07 p.m. UTC, QUILTER, using Facebook Account 1, sent a video of himself grilling food at his residence. QUILTER's face was visible in the video, and I identified him based on comparison to his driver's license photo and other photographs of him from his Facebook account. I also recognized his residence upon execution of the search warrant for his residence on or about November 24, 2020, as described further below in Section **E**.

59. Shortly thereafter, Minor F's Facebook account sent to QUILTER, at Facebook Account 1, two photos of a post-pubescent girl's chest while she is wearing a green and white bra and pulling up her white shirt to reveal her chest. Based on the angle of the photos, they appear to have been taken as "selfies." In the first photo, the girl's face is visible, and based on comparison to photos from Minor F's publicly available Facebook page believed to be of the user of the account (Minor F), I recognized the girl as Minor F. In the second photo, the girl's face is not visible, but the bra appears to be the same green and white one from the first photo of Minor F.

25

60. Also on or about June 19, 2020, QUILTER, using Facebook Account 1, and Minor F's Facebook account then exchanged the following messages:

> QUILTER: That's it I taught u said u love me by the way Beautiful Bra
>
> QUILTER: I want to see Boobs not Bra
>
> Minor F: Wait sweety

Minor F's Facebook account then sent another photo appearing based on the angle and the content to be a "selfie" of her chest, in which the green and white bra was pulled up to expose both of her breasts. Minor F's face was not visible in this photo. QUILTER, using Facebook Account 1, and Minor F's Facebook account then exchanged messages in which, in sum and substance, QUILTER doubted that the photo was of Minor F and accused Minor F of not trusting him because the photo did not show Minor F's face. Minor F's Facebook account then sent two additional photos appearing based on the angles to be "selfies" of her chest, with her green and white bra pulled up to expose both her breasts, and her face visible and looking at the camera. Based on comparison to photos from Minor F's publicly available Facebook page believed to be of the user of the account (Minor F), I recognized the girl in these photos as Minor F.

61. Also on or about June 19, 2020, QUILTER, using Facebook Account 1, and Minor F's Facebook account later exchanged the following messages:

> QUILTER: U still don't trust me but I love your Boobs so now can I see your Pussy now u open it wide so I can see the inside

26

Minor F:        Okay wait

[record of a call through Facebook]

Minor F:        Ill do it later because my mother and father is there

QUILTER:        I want you to open pussy so I can see inside hole

Minor F:        Later sweety

[record of a call through Facebook]

QUILTER:        I wish u can make me a video 3mins long that u mill

                Mausterbate. But I want to see your face that u enjoying it

Minor F:        that's okay sweety

QUILTER:        U put one finger first then w fingers put finger all the way

                inside but I want to see face when finger inside

QUILTER:        Then two fingers

QUILTER:        Please baby

### E.   Search of QUILTER's Residence and Identification of the Subject Account

62.     On or about November 23, 2020, United States Magistrate Judge Beth W. Jantz of the United States District Court for the Northern District of Illinois issued a search warrant for QUILTER's residence in Chicago (20 M 613).

63.     On or about November 24, 2020, law enforcement agents executed the search warrant for QUILTER's residence. KARL QUILTER, as well as his wife, daughter, and daughter's girlfriend were present at the time of the search, and all parties confirmed that KARL QUILTER is the only person that resides in his bedroom

27

and that his wife resides in her own room. Also, KARL QUILTER's passport was located inside of his bedroom.

64.     Law enforcement agents seized multiple electronic devices in KARL QUILTER's bedroom, including the LG Phone, located on his bed, and the Samsung Tablet, located next to the bed among other miscellaneous items. KARL QUILTER confirmed that the LG Phone belonged to him and provided law enforcement with the passcode to unlock the LG Phone. Subsequent law enforcement examination of the Samsung Tablet revealed that its Bluetooth device name is "Karl Quilter." Additional electronics were also seized from KARL QUILTERs bedroom, including a laptop computer and multiple cellular telephones, and all of the seized electronic devices were put in airplane mode and transported to the HSI Chicago Field Office.

65.     Forensic examination of QUILTER's devices is ongoing, and has revealed, among other things, that the Skype application was installed to both the LG Phone and the Samsung Tablet, and that QUILTER appears to have used the **Subject Accounts** on those devices to communicate with others, including Skype users believed based on their user names and the contents of the communications to be Minor E and Minor F.

66.     Based on law enforcement review of the Samsung Tablet and the LG Phone, **Subject Account 1** is the only saved Skype user account on the Samsung Tablet, and **Subject Account 2** is the only saved Skype user account on the LG Phone.

67. According to records from Microsoft, **Subject Account 1** is registered to "Karl Quilter," was created on or about December 7, 2010, and is associated with email address karlquiltersr@yahoo.com. According to service provider records, the login IP address used to access **Subject Account 1** on or about July 5, 2019 was registered to KARL QUILTER at his residence.

68. According to records from Yahoo, the email address karlquiltersr@yahoo.com is associated with "Karl Quilter" at a phone number ending in -5959. According to service provider records, in approximately May 2020, the IP address used to access this email address was registered to QUILTER at his residence.

69. According to other service provider records, the -5959 phone number associated with QUITER's karlquiltersr@yahoo.com email account is subscribed to by "Karl Quilter" at his residence.

70. According to records from Microsoft, **Subject Account 2** is registered to "Karl Quiltet," was created on or about May 12, 2018, and is associated with the same phone number ending in -5959.

71. On both the Samsung Tablet and the LG Phone, law enforcement observed stored communications and records of video calls between the **Subject Accounts** and other Skype users.

72. For example, law enforcement observed that between approximately January 29, 2018, and November 23, 2020, both **Subject Accounts** had

29

communicated with another Skype user whose user name consisted of the same first name and last name as the Facebook display name associated with Minor E's Facebook account.[13] Records from Microsoft also listed in the Skype registration profile the same first name and last name as the Facebook display name associated with Minor E's Facebook account. Based on the account name, the contents of the communications, and the broader investigation, I believe this Skype user to be Minor E.

73.    For example, between approximately November 3, 2020, to November 23, 2020, QUILTER, using **Subject Account 2** communicated with the Skype user believed to be Minor E regarding QUILTER wire transferring money to Minor E via Western Union, using the name and address of a third-party individual that QUILTER said was his relative. Those communications ended as follows:

> QUILTER:    Dont forget i send extra so that u can send me
>
> Minor E:      thankyouso much daddy

74.    Also, stored on the LG Phone, law enforcement observed stored Skype communications sent by QUILTER, using **Subject Account 2**, to another Skype user, whose user name exactly matched Minor F's Facebook profile name. Records from Microsoft also listed in the Skype registration profile the same name as the Facebook display name associated with Minor F's Facebook profile. Based on the

---

[13] Minor E's Facebook account display name also includes what appears to be a middle name or additional last name between her first and last name.

account name, the contents of the communications sent by QUILTER to the Skype account, and the broader investigation, I believe this Skype user to be Minor F.

75.     More specifically, on or about August 21, 2020, QUILTER, using **Subject Account 2**, sent to the Skype user believed to be Minor F a Skype message stating "I did not know u have a Skype account too." As referenced above in Section **D**, QUILTER previously had communicated with Minor F on Facebook, and based on the content and context of this communication and my knowledge of the investigation, I believe that QUILTER was referencing that he did not know that Minor F had a Skype account in addition to her Facebook account. Also, on or about October 29, 2020, QUILTER, using **Subject Account 2**, sent to the user believed to be Minor F a video, which appeared to be a recording of a party taking place at a nursing center. The Skype user believed to be Minor F did not respond to either of the messages.

76.     On or about January 5, 2021, and March 8, 2021, law enforcement sent preservation requests to Microsoft for **Subject Account 1**, and **Subject Account 2**, respectively.

77.     From my training and experience I know that messages found on digital media often do not show the entirety of conversations and that the full content of the conversations is likely stored within Skype servers. Based on my training and experience, the Skype application is often used in sexually explicit cases involving minors.  Skype does not record, or monitor, live video calls, thus making it a viable medium for child exploitation targets.

78. Based on my training and experience in child pornography investigations, I believe that a search of a Skype account contents of individuals engaged in criminal conduct often yields investigative leads relating to:

     a. the identities of participants engaged in and witnesses to possession, receipt, and distribution of child pornography offenses;

     b. the contact information of participants engaged in and witnesses to possession, receipt, and distribution of child pornography offenses;

     c. the timing of communications among participants and other individuals involved in possession, receipt, and distribution of child pornography offenses;

     d. the methods and techniques used in possession, receipt, and distribution of child pornography offenses;

     e. information regarding the physical location of participants engaged in and witnesses to possession, receipt, and distribution of child pornography offenses;

     f. images or videos constituting child pornography;

     g. communications referencing the solicitation, possession, or transmission of child pornography.

## III. BACKGROUND INFORMATION CONCERNING CHILD PORNOGRAPHY

79. Based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training

of other law enforcement officers with whom I have had discussions, computers affect the methods used by people who possess, receive, distribute, and transport child pornography in these ways:

80. Those who create child pornography can produce both still and moving images directly from a common video or digital camera, and other devices that create video and still images, including most cellular telephones and Personal Digital Assistants ("PDA") (*e.g.*, a Blackberry). Images from such devices can be transferred to a computer by attaching the device to the computer using a cable, or by uploading images from the device's memory card directly onto the computer or into a storage account accessible from any computer with the capability of accessing the internet (sometimes referred to as a "cloud" account). Once on the computer, images can then be stored, manipulated, transferred, or printed. This includes transfer to some of the same types of devices that are commonly used to create child pornography, such as cellular telephones and PDAs, as well as other computers. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography.

81. The Internet allows any computer to connect to another computer. Electronic contact can be made to millions of computers around the world. The Internet allows users, while still maintaining anonymity, to locate (i) other individuals with similar interests in child pornography; and (ii) websites that offer images of child pornography. Child pornography collectors can use standard Internet

33

connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. They can also distribute and collect child pornography with peer-to-peer ("P2P") file sharing, which uses software to link computers together through the Internet to form a network that allows for the sharing of digital files among users on the network. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet.

82.    The computer's capability to store images in digital form makes it a common repository for child pornography. Internal and external computer hard drives typically store vast amounts of data, and hard drives with the capacity of 500 or more gigabytes – which can store tens of thousands of images at very high resolution – are not uncommon. Other electronic storage media, such as thumb drives and memory sticks, can store hundreds of images and dozens of videos. Likewise, optical storage media, which includes CD-ROMs and DVDs, and electromagnetic storage media, such as floppy disks, also can hold hundreds of images and multiple videos. Such electronic, optical, and electromagnetic storage media are very commonly used by those who collect child pornography to store images and videos depicting children engaged in sexually explicit activity. Agents who execute child

34

pornography search warrants often find electronic, optical, and/or electromagnetic storage media containing child pornography in the same location as or near the computer that was used to obtain, access, and/or store child pornography.

83. My training and experience, and the training and experience of other agents whom I have consulted, have shown the following:

a. Individuals who possess, transport, receive, and/or distribute child pornography often collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or other images, as well as literature describing sexually explicit activity involving children. Such individuals frequently store their child pornography on multiple electronic, optical, and/or electromagnetic storage media, including not only their computer, but also on external hard drives, floppy disks, CD-ROMs, DVDs, memory sticks, thumb drives, cell phones, PDAs, and other such media. Many of these individuals also collect child erotica, which consist of items that may not rise to the level of child pornography but which nonetheless serve a sexual purpose involving children.

b. Individuals who possess, transport, receive, and/or distribute child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail

35

groups, bulletin boards, Internet Relay Chat, newsgroups, instant messaging, and other similar interfaces.

      c.    Individuals who possess, transport, receive, and/or distribute child pornography often collect, read, copy, or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in address books or notebooks, on computer storage devices, or merely on scraps of paper.

      d.    The majority of individuals who possess, transport, receive, and/or distribute child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. These individuals almost always maintain their collections in the privacy and security of their homes or other secure location. These individuals may keep their collections in locked containers including filing cabinets, safes, or lockboxes. These individuals may also maintain their collections in password-protected or encrypted electronic media. They may keep these passwords, and other information concerning their use of the computer, on handwritten or printed notes that they store in personal areas and around the computer.

e.      Possessors, traders and distributors of child pornography sometimes store their illegal images and videos online in remote storage accounts. Therefore, any records, documents, invoices and materials in any format or medium that concern online storage or other remote computer storage could indicate that a person is storing illegal material in an online storage account.

## IV.    SEARCH PROCEDURE

84.    In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Microsoft to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.      The search warrant will be presented to Microsoft personnel who will be directed to the information described in Section II of Attachment A;

b.      In order to minimize any disruption of computer service to innocent third parties, Microsoft employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein;

85.    Microsoft employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

86.    Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Microsoft employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

## V. CONCLUSION

87.    Based on the above information, I respectfully submit that there is probable cause to believe that the **Subject Offenses** have been committed, and that evidence, instrumentalities, and contraband relating to this criminal conduct, as further described in Section III of Attachment A, are located within one or more computers and/or servers found at Microsoft Corporation, a business with offices located at 1 Microsoft Way, Redmond, Washington 98052. By this affidavit and application, I request that the Court issue a search warrant directed to Microsoft allowing agents to seize the electronic evidence and other information stored on the Microsoft servers following the search procedure described in Attachment A and the Addendum to Attachment A.

FURTHER AFFIANT SAYETH NOT.


Steven Moran
Special Agent
Homeland Security Investigations


Sworn to and affirmed by telephone
this __30th__ day of March, 2021

Honorable SUSAN E. COX
United States Magistrate Judge

39

## ATTACHMENT A

**I.    SEARCH PROCEDURE**

1.    The search warrant will be presented to Microsoft personnel, who will be directed to isolate those accounts and files described in Section II below.

2.    In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.    Microsoft employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant.

4.    Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

**II.    FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF MICROSOFT**

5.    To the extent that the information described below in Section III is within the possession, custody, or control of Microsoft, Microsoft is required to disclose the following information to the government for the following Skype user IDs (the **Subject Accounts**):

**live:karlquilter**

**live: 51746ca6e2623e9e**

a.     all records or other information pertaining to the **Subject Accounts**, including all files, databases, and database records stored by Microsoft in relation to that account or identifier.

b.     all information in the possession of Microsoft that might identify the subscribers related to the **Subject Accounts**, including names, addresses, telephone numbers and other identifiers, email addresses, business information, the length of service (including start date), types of services utilized, means and source of payment for services (including any credit card or bank account number), and information about any domain name registration.

c.     all records pertaining to communications between Microsoft and any person regarding the **Subject Accounts**, including contacts with support services and records of actions taken.

d.     any messages, records, files, logs, or information that has been deleted but is still available to Microsoft Corporation, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f).

e.     All activity logs for the **Subject Accounts** and all other documents showing the user's chats, calls, video calls, or other account activity.

    f.  All photos and videos uploaded, sent, or received by the **Subject Accounts**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos.

    g.  the contents of all messages associated with the **Subject Accounts**, including stored or preserved copies of messages sent to and from the account, draft messages, the source and destination addresses associated with each message, the date and time at which each message was sent, and the size and length of each message.

    h.  all records or other information regarding the identification of the **Subject Accounts**, to include full name(s), physical address(es), telephone number(s) and other identifier(s), records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number).

    i.  all records or other information stored by an individual using the **Subject Accounts**, including address books, contact and buddy lists, calendar data, pictures, and files.

    j.  All records or other information regarding the devices and internet browsers associated with, or used in connection with, the **Subject Account**,

including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string.

   k. All IP logs, including all records of the IP addresses that logged into the **Subject Accounts**.

   l. All Skype accounts associated with the **Subject Accounts**, by cookies, recovery email address, or telephone number.

  Pursuant to 18 U.S.C. § 2703(d), the service provider is hereby ordered to disclose the above information to the government within 14 days of the signing of this warrant.

## III. Information to be Seized by Law Enforcement Personnel

  All information described above in Section II that constitutes evidence, instrumentalities, fruits, and contraband concerning the sexual exploitation of children; child pornography offenses; coercion or enticement of minors; or travel with intent to engage in illicit sexual conduct, in violation of Title 18, United States Code, Section 2251, 2252, 2252A, 2422, and 2423 (the "**Subject Offenses**"), as follows:

  1. Items related to the identity of the user or users of the **Subject Accounts**.

  2. Items related to the physical location of the users of the **Subject Accounts** at or near the times of the **Subject Offenses**.

  3. Items related to the identities and contact information of participants in or witnesses to the **Subject Offenses**.

4

4.      Images of child pornography as defined in 18 U.S.C. § 2256(8).

5.      Items, including communications to or from the **Subject Accounts**, concerning the possession, receipt, production, advertisement, or distribution of child pornography as defined in 18 U.S.C. § 2256(8).

6.      All items relating to Minor A, Minor E, and Minor F.

7.      Items concerning minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Items concerning any and all international travel by KARL QUILTER.

9.      Items concerning any and all monetary transfers involving the use of a third-party money-transfer service, such as Western Union and MoneyGram.

10.      All of the non-content records described above in Section II.

5

## ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the web-hosting company, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.    searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein.

b.    surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein.

c.    opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein, and/or

d.    performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.